CONSOLIDATED ELECTRIC STORAGE CO. v. ATLANTIC TRUST CO.

(Supreme Court, Appellate Division, First Department.   December 31, 1897.)

REFORMATION OF INSTRUMENT—EVIDENCE.

A certain traction company was obligated to guaranty payments to be made by plaintiff to B. That company applied to defendant to make the guaranty, and, defendant's power to do so being questioned, the traction company made its promissory note for $215,000 to defendant, secured by collateral, and thereby procured a loan on the latter's books, which it then, in discharge of its obligations to plaintiff, paid to the defendant to hold in trust for plaintiff. Defendant then made an agreement with plaintiff and B. by which, for actual valuable consideration, it acknowledged the receipt of $215,000 from plaintiff as a deposit, which it agreed to hold in trust to pay to B. $65,000, and also the balance in so far as plaintiff should fail to make its agreed payments to B., and that so much of the fund as might remain "shall  *   *   *   be repaid to the party of the first part" (the plaintiff). This contract was carefully drawn by the attorneys for plaintiff and B., and submitted to defendant without any misrepresentations as to its contents, and was approved by its executive committee, and executed, with full knowledge of all the transactions involved, and defendant made some payments under it accordingly. B. released all claim for further payments, and plaintiff brought this action to recover the balance. It appeared that the note and collateral held by defendant were probably worthless. In its answer it asked that the agreement be reformed by striking out the clause above quoted. *Held,* that no basis for reformation existed, and that defendant was liable.

O'Brien, J., dissenting.

Appeal from special term.

Action by the Consolidated Electric Storage Company against the Atlantic Trust Company.  Judgment for defendant, and plaintiff appeals.  Reversed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

William B. Hornblower, for appellant.

J. Langdon Ward, for respondent.

INGRAHAM, J.   This action is brought to recover the balance of a sum of money deposited by the plaintiff with the defendant, and which the defendant promised to pay.  The acknowledgment of a deposit and promise is contained in a written instrument dated June 2, 1890, to which the Consolidated Electric Storage Company (the plaintiff) was party of the first part, the Brush Electric Company party of the second part, and the Atlantic Trust Company (the defendant) party of the third part.  The obligations of the various parties to each other under this agreement are clearly stated.  The instrument was drawn by a skilled draftsman, in concise and express terms, and no uncertainty exists as to the construction to be given to it.  It was prepared by the attorneys for the parties of the first and second parts, respectively, clearly embodying what they intended should be the agreement between the parties executing the instrument.  It was presented to the party of the third part, the defendant, after its execution by the parties of the first and second parts; was executed by it after a meeting of the executive committee, where the instrument was before the committee, and its execution was

authorized by such committee. When executed by the defendant, the counsel for the parties of the first and second parts were present, and no statement was made by either of them, or by anybody in their presence, that the agreement was other than what, upon its face, it purported to be. One copy remained in the possession of the defendant, was acted upon by it as well as by the other parties to the action, and, so far as appears, no objection was made to it until the commencement of an action by the plaintiff against this defendant in the court of chancery in the state of New Jersey in the latter part of 1891. The instrument itself, after reciting the execution of an agreement between the parties of the first and second part, a copy of which was annexed, recites that in and by the said instrument between the parties of the first and second part the party of the first part (the plaintiff) had covenanted to furnish satisfactory personal security that the terms of the agreement between the parties of the first and second part would be carried out; provided, "that, for the purpose of securing the punctual and faithful fulfillment of the said instrument on its part, the party of the first part hereto has given, granted, assigned, and transferred, and does hereby give, grant, assign, and transfer, unto the party of the third part [the defendant] hereto, the sum of two hundred and fifteen thousand ($215,000) dollars, the receipt of which sum last mentioned is hereby acknowledged by said party of the third part [the defendant], in trust, however, and upon the trust following; that is to say." The trust upon which this defendant agreed to hold this sum of $215,000 was first to apply a sum of $65,000 to the payment of two sums of money provided for in the agreement to be paid to the party of the second part, and to hold the balance of the said sum of $215,000 in trust to pay the same, or so much as should be necessary, to the party of the second part, in case the party of the first part should fail to pay the various sums of money to be paid to the party of the second part under the agreement between the parties of the first and second part; and further providing that "so much of said trust fund as may remain, with all accumulations of interest thereon, if any, shall, subject to the compensation of the trustee, be repaid to the party of the first part"; and it is to recover for such unused balance of this trust fund that this action is brought. The defendant does not claim that the whole amount of the $215,000 has been paid under the contract. The answer of the defendant denies the deposit by the plaintiff of any money with the defendant, concedes the execution of the instrument referred to in the complaint, and sets up as a counterclaim facts which the defendant insists justify a judgment for the reformation of the contract, and asks for a judgment reforming the contract, and a money judgment in favor of the defendant against the plaintiff for $74,390.31. The court below sustained the defendant's counterclaim, reformed the instrument sued on, and gave judgment for the defendant against the plaintiff for the sum of $95,426.12, and from that judgment the plaintiff has appealed.

Before examining the right of the plaintiff to recover any judgment against the defendant upon this contract, we should first ascertain whether or not the judgment of the court below reforming the con-

tract and awarding judgment in favor of the defendant against the plaintiff can be sustained.   The principle upon which courts of equity reform contracts in writing is well settled.   It is not based upon any power of the court to make a contract between the parties which they have not made, or to relieve a party from a contract which subsequently turns out to be disastrous.   The whole object of the exercise of this jurisdiction is to make a writing express what the parties really intended that it should express, and the power is never exercised unless it clearly appears that the parties to the written agreement had made a verbal agreement which it is understood should be reduced to writing, but, when so reduced to writing, did not correctly represent the real agreement which had been made between the parties.   The facts upon which such relief is granted must show either—First, that after the verbal agreement was made, through a mistake of the draftsman, or from some other cause, the real intention of the parties was not correctly expressed in the writing subsequently executed; or, second, that such verbal contract was not correctly stated in the writing by reason of a mistake of one party, who was induced to execute the writing as a correct expression of their verbal agreement by the misrepresentations or fraud of the other party.   No case has been cited to us in which a court has reformed a written instrument, unless either one or the other of these facts were proved.   No jurisdiction to reform a contract exists upon showing that a party executing it misconceived the extent of his liability, or made a contract which subsequently has proved to be an unfortunate one.   There must be positive proof of the existence of a verbal agreement, to carry into effect which the writing was prepared and executed; and that such writing does not express the agreement, either from a mutual mistake as to its contents or effect, or a mistake as to its contents and effect by one party, where its execution was induced by the misrepresentation or fraud as to its contents or as to its legal effect by the other.   These principles are so well settled, and have been so often applied, that it is hardly necessary to cite authorities in support of them.   As was said by Judge Gray, in delivering the opinion of the court in Avery v. Society, 117 N. Y. 458, 23 N. E. 4:

"An agreement between parties is presumed to contain what they intended, and to comprise their whole sense of the subject-matter, and therefore, when it is made to appear that by a mutual error the contract varied from their intent, or that by some fraudulent practices there has been a suppression, or omission, or insertion of material matter, which would operate as a surprise or a fraud upon a party, ground for relief is made.   So, too, equity will relieve, where there has been a misrepresentation of some important fact, by which a party is misled to his disadvantage, or so entrapped as that an undue advantage is gained over him; * * *   the design and purpose of equity being to reconstitute an agreement between parties, where some positive proof shows that it is not, in material respects, in truth such as was intended by them."

And, as was said in 15 Am. & Eng. Enc. Law, p. 651:

"The evidence to justify the reformation of a written instrument must be clear, strong, and satisfactory, and it must be made apparent that the instrument was executed under a misunderstanding and mistake, and that it does not express the intention of the parties.   But when, after deliberation, one course is taken in preference to another, the parties are bound."

It is also clearly established that the mere fact that one party to an agreement has, through inadvertence, failed to notice a stipulation contained therein, which was not induced by any fraud or misrepresentation on behalf of the other contracting parties, is no ground for the reformation of a contract by striking out, or materially altering, the clause imposing the liability. As was said by the court of appeals in the case of Moran v. McLarty, 75 N. Y. 29:

"The plaintiff's testimony does not contradict this instrument, as it only shows his intention. He states that he only read it over partially, but, with full opportunity to examine its contents, he failed to observe the guaranty which was contained in the same, and, after this, he voluntarily signed and executed the assignment. It was his own fault and negligence that he did not notice the guaranty, and for this the defendant, or her attorney who transacted the business on her behalf, were not responsible. A careful attention on the part of the plaintiff at the time would have avoided the difficulty, and relieved him from liability. For the inadvertence of the plaintiff in not examining the assignment, and not giving such attention as was required, the defendant should not suffer, as a fair presumption may be indulged that neither she nor her attorney had any intention to leave out the guaranty. There was no mutual mistake, and the plaintiff cannot maintain the action."

These principles being thus established, we are to examine the testimony, and see whether there is any evidence to show that this written instrument sued on through mistake fails to show the real contract as it was made between the parties. Let us see from the testimony introduced by the defendant, upon which it bases its claims for judgment, just what contract was agreed to be made between these three parties who executed this instrument in question; and just here it will be well to note that two of the parties who had much to do with the making of this agreement are dead,—Mr. Belknap, who, according to the testimony of the defendant, figured conspicuously in the whole negotiations, and Mr. Osborne, the attorney for the plaintiff, who assisted in preparing the instrument in question, and who was present at its execution by the defendant. We are deprived, therefore, of their statement as to the contract which was made between the parties, and which was assumed to have been evidenced by this instrument. It appeared from the evidence that on March 28, 1889, the Brush Electric Company had given an option to Messrs. Bracken & Waite, of New York, for an exclusive license to operate under certain United States patents therein specified, upon the payment of certain royalties to the Brush Electric Company. That option provided that Messrs. Bracken & Waite, if it was accepted, were to give to the Brush Electric Company satisfactory personal security, and that the terms of the agreement to be entered into in accordance with the option should be carried out. On April 10, 1890, Messrs. Bracken & Waite entered into an agreement with Robert Lenox Belknap, which recited that certain persons acting in the interest of Belknap were to organize a company to be known as the Consolidated Electric Storage Company, and provided that Bracken & Waite should assign and transfer to such company to be organized their contract or agreement known as the "Brush Option." The company, in full consideration of the conveyance to it of the said option, was to issue and deliver to Bracken & Waite all of the capital stock, amounting to

$3,000,000, Bracken & Waite agreeing to return and deliver to the Atlantic Trust Company of New York, or their nominee, 110,000 shares of the said capital stock, in trust to be delivered by said trustees as therein or otherwise provided. The remaining 10,000 shares in the hands of Bracken & Waite shall thereupon become and be the sole and exclusive property of Bracken & Waite. ∗ The agreement also provided that Belknap should furnish to the Atlantic Trust Company, as trustee. immediately, upon the demand of Bracken & Waite, all the moneys and securities required to be paid or secured to the Brush Electric Company, and by virtue of and in pursuance of the terms of said option or agreement of the 28th day of March, 1889; and that all of said moneys and the said security are to be furnished by the party of the second part (Belknap) promptly on the dates and in conformity with all the conditions set forth in said option or agreement, and that in conformity therewith the party of the second part (Belknap) agreed to furnish security to the Brush Electric Company, pursuant to the terms of the said option or agreement, in the sum of $165,000. Said Belknap further agreed that 60,000 shares of the capital stock of the Consolidated Electric Storage Company should be held by the Atlantic Trust Company, or its nominee, in trust to deliver the same to Belknap or his assigns, upon his or their performance of the stipulations and agreements contained in this contract, and upon the further performance by Belknap or his assigns of the following conditions: To provide working capital for the said the Consolidated Electric Storage Company in the sum of at least $100,000, and further to provide the sum of at least $100,000 for the payment of the unfunded debts and obligations of the Julien Electric Traction Company; and also to provide for the payment of principal and interest of certain first mortgage bonds of the said Julien Electric Traction Company, as of the terms of the said bonds. In pursuance of this contract between Bracken & Waite and Belknap, on the 21st of April, 1890, Bracken & Waite transferred to the Consolidated Electric Storage Company (the plaintiff) the said option or agreement known as the "Brush Option," and subsequently, by an agreement of license dated June 2, 1890, the Brush Electric Company granted to the plaintiff the sole and exclusive right and license to make, put into operation, sue and sell, and to license others to do the same throughout the United States and the territories thereof, the improvements to secondary batteries under and in pursuance of certain letters patent of the United States, the plaintiff to pay to the Brush Company certain royalties described in the license, and also two sums of money amounting in the aggregate to $65,000, within 60 days from the date of the agreement, and the plaintiff further agreed to give to the Brush Company, simultaneously with the execution and delivery of the agreement, "satisfactory personal security that the terms of this agreement will be carried out on its part, for itself and for those who shall manufacture hereunder, under license or authority granted by it." To carry out this latter provision the contract in question was executed by the plaintiff and the defendant, as before stated. Prior to the execution of these agreements, a corporation had been organized, known as the United Electric Traction Company, of which Belknap

was president, and it appears to have assumed the obligations imposed
upon Belknap under the agreement of April 10, 1890, between Bracken
& Waite and Belknap, to furnish the money necessary to make the
payment to be made to the Brush Electric Company, the security re-
quired by the contract between the Brush Electric Company and the
plaintiff, and the amount of money necessary for the working capital
of the plaintiff; and Belknap, as representing that company, entered
into negotiations with the defendant to furnish such security.   These
negotiations resulted in a contract between the defendant and Bel-
knap, representing the traction company, the terms of the agreement
between Belknap and the defendant being evidenced by a letter dated
April 22, 1890, from Belknap to the company.   The proposition of
Belknap, and which was accepted, was as follows:

"The Atlantic Trust Company to furnish: First. Its guaranty to the Brush
Electric Company that the minimum royalty accruing to the Brush Company
under the license amounting in six years to $150,000 will be paid as it ma-
tures.   Second. To furnish to this company the money needed to make the
cash payments to the Brush Company under the option as the same is re-
quired, namely, $40,000 within thirty days and $25,000 within sixty days.
Third. To furnish to this company [the traction company], for working capi-
tal for the Consolidated Electric Storage Company, $20,000 within the next
sixty days, and an additional $80,000, should the same become necessary.
Fourth. To furnish $100,000 as the same becomes necessary, for the purpose
of paying debts of the Julien Electric Company to that amount as they be-
come due, holding the bonds which will thus be liberated as collateral until
such time as all of the stock of the Julien Electric Traction Company has
been surrendered.   All the advances made to run for six months at six per
cent. interest, and to be made on the note of the company secured by the
deposit with you of all the stock of the Julien Electric Traction Company
which is surrendered, by the bonds and evidences of debt of the Julien Elec-
tric Company which are paid, by the assignment of all the interest of this
company in 60,000 shares of the capital stock of the Consolidated Electric
Storage Company, and a certificate of 10,000 shares ($230,000) of the preferred
stock of this company, the proceeds of which stock, when sold, to be applied
to the payment of the advances,"—and, in addition, certain other collateral
securities specified.

The letter then proceeded:

"In order to make it an inducement to your company [the defendant] to
make this arrangement, and to make them interested in the pecuniary suc-
cess of the enterprise of this company, there will be contributed 2,000 shares
of its general and common stock ($50,000) being part of the stock referred to
above as being available for the uses of the company."

This communication was followed by another communication from
Belknap, as president of the United Electric Traction Company, dated
April 28, 1890, and which was as follows:

"Referring to my letter of the 22nd instant, and the proposition therein
contained, I beg to hand you herewith assignments by this company as fol-
lows.   [Then follows a specification of the stock and securities mentioned
in the letter of April 22, 1890, the letter then continuing]:   All of the above
to be held by you as collateral security for the repayment to you of the
moneys advanced upon the notes of this company in accordance with the
terms of said letter of April 22nd, above referred to."

And on April 18, 1890, the plaintiff transmitted to the defendant
a certificate for 119,960 shares of the capital stock of the plaintiff
corporation, issued to the defendant as trustee.   Accompanying this
stock was a copy of a resolution of the directors of the plaintiff cor-

poration, authorizing the issuance of this stock for the purchase and acquiring of certain described property, which included the Brush license.

It is not disputed that the defendant had knowledge of all these negotiations between the parties, the transfer to the plaintiff of the Brush patent, and the obligation assumed by Belknap or the traction company, of which he was president, to the plaintiff; and that, in pursuance of this proposition of Belknap or the traction company, of which he was president, to the defendant, the latter agreed to furnish the security required by the Brush license.    The Brush Company and the plaintiff having agreed to the form of the license which was executed, it was proposed that the defendant should guaranty the performance by the plaintiff of the obligations of the plaintiff as provided for by the license.    When that question was submitted to the Brush Company, that company refused to accept a contract made by the defendant as guarantor, they being advised by their counsel that the defendant was not competent to enter into such an obligation, as it had no power under its charter to guaranty such an obligation.    That objection by the counsel for the Brush Company was communicated to the defendant, and seems to have been acquiesced in by it.    The president of the trust company testified that Belknap told him that the Brush Company would not accept the form of the simple guaranty of the trust company; that, in the opinion of their attorneys, it was illegal for the trust company so to do; that the Brush Company would be satisfied with the form or method of doing the business which he suggested or presented then.    The proposition was that the United Electric Traction Company should make its note for the total amount of the down payments of $65,000 and the total amount of the minimum royalty payments, $150,000, making a total of $215,000; that note should be lodged with the trust company; and, on the other hand, a certificate of deposit was made of the exact same amount,— $215,000.    The notes were to bear interest at 6 per cent., and when any payment was made on the certificate,—the deposit bore 4 per cent.,—when any down payments or payments for the minimum royalty accounts were made, they were to be charged on the certificate of deposit, and credited on the note.    The note and certificate of deposit were always to be of equal amount.    New notes were to be given when payments were made, payable in six months, at 6 per cent., and those were expected to be paid.    "He spoke of the paper being prepared legally and suitably which the Brush Company would accept and the Consolidated Electric Storage Company.    *    *    * I said that would be satisfactory if it carried out the original proposition to guaranty the Brush Company."    To carry this understanding into effect, and as a construction by the parties as to the agreement which had been made, the parties proceeded to put the defendant trust company in a position to make the agreement or contract contemplated, and which would be satisfactory to the Brush Company and to the plaintiff.    The United Electric Traction Company executed its note for $215,000, dated June 4, 1890, payable six months after date, to the order of the defendant, at 6 per cent. per annum, which recited that the maker of the note had deposited with the Atlantic Trust

Company, as collateral security for the payment of the note, the property described in the letter of Belknap, as president of the United Electric Traction Company, to the Atlantic Trust Company of April 28, 1890, which note contained a power of sale of such securities so deposited in the event of the failure of the maker of the note to pay the same at maturity. Belknap, as president of the traction company, inclosed that note in a letter to the trust company, which reads as follows:

"Atlantic Trust Company—Gentlemen: Herewith please find our note at six months for two hundred and fifteen thousand ($215,000) dollars, with interest. Please place the same to the credit of our company, and oblige,
"Yours truly,                          R. L. Belknap, President."

This note and letter were received by the defendant company, and the traction company was credited in its general account with the defendant with the sum of $215,000. There can be no doubt that this was a discount of the note, and that thereupon the defendant became indebted to the traction company in the sum of $215,000, and became the owner of its note or obligation secured by the collateral security mentioned. The traction company then drew its check upon the defendant, dated on the same day, and inclosed such check in a letter to the defendant, as follows:

"Atlantic Trust Company—Gentlemen: Herewith please find our check on yourselves for two hundred and fifteen thousand ($215,000) dollars, for which you will please issue your certificate of deposit in the name of the United Electric Traction Company, and oblige,
"Yours truly,                          R. L. Belknap, President."

That check was received by the defendant, inclosed in this letter; and on the back of the check the defendant indorsed: "Received payment. Atlantic Trust Company." In pursuance of this direction in this letter, and subsequent to the receipt of the check, the defendant issued its certificate of deposit, dated on the same day, which recited that the Atlantic Trust Company had received from the United Traction Company the sum of $215,000 in current funds, upon which the said trust company would allow interest at the annual rate of 4 per cent. from that date, and on five days' notice would repay the like amount in current funds, with interest, to the said United Electric Traction Company, or its assigns, on the return of the certificate of deposit, which was stated to be assignable only on the books of the trust company. In the face of this proceeding, made necessary to carry out the device suggested by Belknap, by which the defendant could execute an instrument which would be accepted by the plaintiff and the Brush Company as a compliance with the obligation of the traction company to furnish the security, it is difficult to see how there could have been any misunderstanding as to the nature of that agreement. Here it was stated that the trust company did not have power, under its charter, to execute the agreement guarantying the performance by the plaintiff of its obligation to the Brush Company; and a substitute for that guaranty was proposed, which the Brush Company and the plaintiff would accept. That substitute required the making of a note by the traction company, who were bound to furnish that money under the agreement

with the plaintiff, and upon which agreement the plaintiff's stock had been issued; the discount of such note by the trust company; the payment of the proceeds of such discount by the traction company to the trust company, who were to issue for it a certificate of deposit, payable to the traction company upon demand or upon five days' notice; and the holding of the money represented by this certificate of deposit by the trust company as trustee as money to be applied to the payment of any amount due to the Brush Company. That this arrangement was not a mere form, or was not understood by the parties to be a mere form, is perfectly apparent from the fact that it would be as illegal for the trust company to make such an agreement as a mere form of guaranty as it would to make a simple contract of guaranty. The substantial objection was that the defendant had not power, under its charter, to make an agreement of guaranty. It could lend its money to the traction company, and the traction company could use the money as a guaranty fund to protect the Brush Company. Whatever was the arrangement as between Belknap and his company and the trust company, the substantial agreement, so far as it affected the plaintiff and the Brush Company, was that it should not be an agreement of guaranty, but a deposit of money, the property, not of the defendant, but of the electric company, which would guaranty the performance of the contract by the plaintiff to the Brush Company. The arrangement, as stated by Belknap, and as carried out by this transaction between Belknap and the defendant, could mean nothing else.

This arrangement thus having been made, by which a guaranty satisfactory to the Brush Company and the plaintiff was provided for, counsel for the Brush Company and the plaintiff met to prepare the agreement to carry it into effect, and the contract in suit was the result. That contract embodied, in terms, the arrangement that had been made between the plaintiff and the defendant. It is true that, in addition to the provisions as to the deposit and the payment of the money due to the Brush Company from this trust fund held by the defendant, which had been furnished by the traction company, the balance of that trust fund, after payment of the amounts due to the Brush Company, were to be repaid to the plaintiff; but that money belonged to the plaintiff, under the agreement between Belknap and the plaintiff's assignor of the option, and which the traction company had assumed to carry out. Belknap expressly bound himself to furnish this money to the plaintiff in consideration of the plaintiff's issue to him of its capital stock; and of that fact the defendant had full knowledge, it having in its possession a copy of the contract between Belknap and the assignors of the option. But, with the exception of this provision, the form of the contract appears to be exactly in accordance with the proposition made by Belknap to the defendant, and accepted by it. The counsel for the Brush Company and the plaintiff then prepared the agreement in question. It was the agreement which both companies were willing to accept as a compliance by the traction company with the obligation to the plaintiff. It was sent to Cleveland, Ohio, to be executed by the Brush Company. On

its return it was executed by the plaintiff, and was then taken by counsel for the Brush Company to the defendant, to be executed. There was present at that time also the counsel for the plaintiff company. That contract was there presented to the president of the defendant. A meeting of the executive committee of the defendant company having been called, to whom the contract was submitted, it was approved and executed by the company. No objection was made to it, and no statement as to its effect or contents was made in the presence of counsel for either of the corporations, the Brush Company or the plaintiff. It appears that Belknap had had some conversation with the president of the defendant about it before, and that at the special meeting of the executive committee called to pass upon the question as to the execution of this instrument Belknap stated "that the execution of this paper took the place of the guaranty. He stated that this paper was satisfactory to the Brush Company guarantying their down payments and minimum royalties, and it was executed. He said nothing further about it." Upon that statement the executive committee authorized the president to execute the agreement, and it was executed by him. In all this there is not the slightest evidence that this plaintiff or the Brush Company, or any one representing either of them, made any representation as to the contents of this agreement, except that the execution of the agreement would be a satisfactory compliance with Belknap's or the traction company's obligation to provide the money necessary to make the payments, and that it was a satisfactory arrangement in place of the personal guaranty provided for in the agreement. Belknap's explanation to the company, even assuming that the plaintiff was bound by what he said, fell far short of a representation as to the obligation of the defendant under the agreement, or any misrepresentation as to its terms; nor was there the slightest evidence to show that this agreement did not fairly carry out the proposition made by Belknap and assented to by the defendant. As before stated, it was expressly understood that the Brush Company refused to accept the defendant as a guarantor, and the agreement was devised to take the place of such a guaranty by the defendant; and, that agreement involving the loan by the trust company to the traction company of this sum of $215,000, and its holding that sum in trust as a guaranty for the execution to the trust company of the obligations of the plaintiff, some disposition had to be made of the balance of the fund after the Brush Company had been secured. The disposition made by the agreement was that it should be returned to the corporation which was entitled to it (the plaintiff); the trust company having loaned it to the traction company, and the traction company having, in discharge of its obligations to the plaintiff, paid it to the trust company, to hold for the plaintiff. Both the president of the trust company and Mr. Hitchcock, the vice president, swore that they did not read the paper carefully, and did not notice this provision for the repayment of the balance not needed to secure the Brush Company to the plaintiff; but the mere fact that they did not notice such clause in the agreement presents no ground for a reformation of the contract by striking it out.

As was said in the case of Moran v. McLarty, supra:

"The plaintiff's testimony does not contradict this instrument, as it only shows his intention. He states that he only read it over partially, but, with full opportunity to examine its contents, he failed to observe the guaranty which was contained in the same, and after this he voluntarily signed and executed the assignment. It was his own fault and negligence that he did not notice the guaranty, and for this the defendant or her attorney who transacted the business on her behalf were not responsible. A careful attention on the part of the plaintiff at the time would have avoided the difficulty, and relieved him from liability. For the inadvertence of the plaintiff in not examining the assignment, and not giving such attention as was required, the defendant should not suffer, as a fair presumption may be indulged that neither she nor her attorney had any intention to leave out the guaranty. There was no mutual mistake, and the plaintiff cannot maintain the action."

Upon this evidence there can be no doubt but that the Brush Company and the plaintiff intended and insisted upon having this provision in the contract. They had no intention of executing the contract without including it, and there was, therefore, no mutual mistake. No statement having been made by any one to the defendant that this agreement did not contain such a provision, or that the ultimate disposition of this trust fund was not to go to the plaintiff, or was to go in any other direction, there was no fraud to justify the reformation of the contract. By this judgment of the court below the contract is turned into a simple guaranty by the trust company upon the fund. There was a mutual mistake as to what the instrument in question should contain, and this in the face of the undisputed evidence that the Brush Company refused to accept a contract of guaranty, and this instrument was drawn up to take the place of such a contract. Thus a court of equity has changed this agreement into the very agreement which the Brush Company refused to accept, and which all the parties to it understood it was not. This is certainly a remarkable instance of a reformation of a contract. We think, therefore, that the judgment, so far as it reformed the contract, was erroneous, and it must be reversed.

We come back to the right of the plaintiff to recover upon the contract as it exists in the form in which it was executed, and it seems to me that there can be but one answer to that question. The contract in express terms provides that the defendant will pay any sum of money not needed to secure the Brush Company to the plaintiff. The evidence shows that the contract between the Brush Company and the plaintiff has been terminated, and the Brush Company makes no claim to the balance of this trust fund remaining with the trust company. As to the balance of such trust fund, the contract provides that the defendant will pay it to the plaintiff, and I can see no reason why that contract should not be enforced. It is not claimed that there was not a valid consideration for this contract. The whole case shows that there was. The original proposition from Belknap to the defendant was that on all of the advances made by the trust company to the traction company the trust company should receive 6 per cent. interest, and the note given to the trust company by the traction company provided for the payment of such

interest. In addition to that, other notes were to be given after each payment by the trust company, which other notes were to bear 6 per cent. interest, and these notes were given as the various payments were made. The trust company was to allow 4 per cent. interest on the balance remaining due upon this certificate of deposit, but the difference between such interest and the interest that they were to receive upon the discount of the notes and the interest that they were to receive for the payments which they had actually made was a sufficient consideration for their executing the agreement. In addition to that, they received 2,000 shares of the general and common stock of the traction company at the par value of $50,000, and that stock was delivered to it with the express statement that it was delivered in order to make it an inducement "to your company to make this arrangement, and to make them interested in the pecuniary success of the enterprise of this company." The agreement also expressly provided that defendant was to receive compensation as trustee. Thus the trust company was to receive 2 per cent. interest, net, upon the amount of this note for the whole time that it had to run, and as long as the trust fund was in its possession; and, in addition to that, it was to receive 6 per cent. interest upon all payments that it should make out of the trust fund until such amount was repaid to the trust company by the traction company, and was to have $50,-000 at the par value of the stock of the traction company as the consideration to induce it to enter into this agreement and compensation for acting as trustee. There was thus ample consideration for the contract, assuming the obligation to the Brush Company and the plaintiff to pay this sum of $215,000, and relying upon the obligation of the traction company to repay that sum to it, secured by the collateral security that was deposited. It made the agreement after full opportunity of examining the contract, and I can see no reason why the contract should not be enforced. It is quite true that the traction company, upon whom it relied for repayment of the money which it had advanced to it, has failed to pay. It is quite probable that the collateral security upon which it relied to secure such payment is valueless. In other words, the defendant, having made a bad bargain, does not want to stick to it; but, as the contract was a valid contract, and imposed upon the defendant a liability, there is no more reason why it should escape the payment of this than of any of its obligations. There is not a particle of evidence to show that Belknap represented this plaintiff in these negotiations. All of the negotiations and agreements with the defendant were made by Belknap as president of the traction company. He was not an officer or director of the plaintiff, and I fail to find any evidence in the case which shows that he was interested in any way in the plaintiff corporation, except a statement as a preamble to one of the agreements made that this company was to be organized in Belknap's interest. No reliance upon Belknap's statement could affect this plaintiff's right to recover, but I have discussed the question assuming that Belknap had the authority to represent the plaintiff, and that he made this statement as its representative; but I can find

no evidence of any false or fraudulent statement by Belknap to the plaintiff, or any mistake on his part as to what this contract really contained.

It seems to me, therefore, that upon the evidence the plaintiff was entitled to recover the balance remaining undisposed of of this sum of $215,000, with interest, and the judgment should be reversed, and a new trial ordered, with costs to the appellant to abide the event.

VAN BRUNT, P. J., and WILLIAMS and PATTERSON, JJ., concur. O'BRIEN, J., dissents.